15-1841-ag (L)
*NLRB v. Pier Sixty, LLC*

# In the
# United States Court of Appeals
## for the Second Circuit

AUGUST TERM 2015

Nos. 15-1841-ag (L), 15-1962-ag (XAP)

NATIONAL LABOR RELATIONS BOARD,
*Petitioner-Cross-Respondent*,

v.

PIER SIXTY, LLC,
*Respondent-Cross-Petitioner*.

On Petition for Review and Cross-Application for Enforcement of an
Order of the National Labor Relations Board

ARGUED: APRIL 5, 2016
DECIDED: APRIL 21, 2017
AMENDED: MAY 9, 2017

Before: KEARSE, CABRANES, and CHIN, *Circuit Judges*.

This case presents two questions. The first is whether respondent has forfeited its challenge to the legality of the appointment of the Acting General Counsel of the National Labor Relations Board (the "NLRB" or the "Board"). The second question is the extent to which the National Labor Relations Act (the "NLRA") protects an employee's comments on social media and the point at which an employee's conduct is so "opprobrious" as to lose the NLRA's protection.

We conclude that the respondent forfeited its challenge to the Acting General Counsel's appointment by failing to raise that argument before the Board as required by 29 U.S.C. § 160(e). We also affirm the NLRB's determination that the respondent violated Sections 8(a)(1) and 8(a)(3) of the NLRA by discharging Hernan Perez since Perez's conduct was not so "opprobrious" as to lose the protection of the NLRA. Our decision rests heavily on the deference afforded to the NLRB's factual determinations, found after a six-day bench trial informed by the specific social and cultural context in this case. We nonetheless note that Perez's conduct sits at the outer-bounds of protected, union-related comments for the reasons set forth below.

Accordingly, we **GRANT** the Board's application for enforcement and **DENY** Pier Sixty's cross-petition for review.

———

THOMAS V. WALSH, Jackson Lewis P.C., White Plains, NY, *for Respondent-Cross-Petitioner*.

2

BENJAMIN M. SHULTZ and Scott R. McIntosh, Attorneys, Appellate Staff, *for* Benjamin C. Mizer, Principal Deputy Assistant Attorney General, U.S. Department of Justice, Civil Division, Washington, DC;

AMY H. GINN, Attorney (Jennifer Abruzzo, Deputy General Counsel; John H. Ferguson, Associate General Counsel; Linda Dreeben, Deputy Associate General Counsel; Usha Dheenan, Supervisor Attorney), *for* Richard F. Griffin, Jr., General Counsel, National Labor Relations Board, Washington, DC, *for Petitioner-Cross-Respondent.*

—————

JOSÉ A. CABRANES, *Circuit Judge*:

This petition for enforcement of an order of the National Labor Relations Board (the "Board" or the "NLRB") and an employer's cross-petition for review present two questions. The first is whether the employer, Respondent-Cross-Petitioner Pier Sixty, LLC ("Pier Sixty"), has forfeited its challenge to the legality of the appointment of Acting General Counsel of the NLRB, Lafe Solomon ("Solomon"). Pier Sixty argues that Solomon, who authorized the complaint in this case, served in violation of the Federal Vacancies Reform Act of 1998

3

(the "FVRA")[1] and that the complaint was therefore issued illegally. Although Pier Sixty failed to raise this argument before the Board, as required by Section 10(e) of the National Labor Relations Act (the "NLRA"),[2] Pier Sixty argues that we may nonetheless consider it on appeal, under the "extraordinary circumstances" exception in that section.

The second question presented is what constitutes "opprobrious conduct" in the context of an employee's comments on social media. To be more precise: the NLRA generally prohibits employers from terminating an employee based on that employee's union-related activity. But even an employee engaged in protected activity "can, by opprobrious conduct, lose the protection of the [NLRA.]"[3] We are thus required to resolve whether an employee's Facebook post insulting his boss's mother and encouraging other employees to vote for the union ought to receive protection under Sections 8(a)(1) and 8(a)(3) of NLRA.[4]

---

[1] 5 U.S.C. §§ 3345 *et seq.*

[2] Section 10(e) of the NLRA, 29 U.S.C. § 160(e), provides, in relevant part: "No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."

[3] *NLRB v. Starbucks Corp.*, 679 F.3d 70, 79 (2d Cir. 2012) (quoting *Atl. Steel Co.*, 245 NLRB 814, 816 (1979)).

[4] Section 7 of the NLRA, 29 U.S.C. § 157, provides, in relevant part:

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their

We hold that Pier Sixty has not shown the existence of an "extraordinary circumstance" that requires us to waive the ordinary rule against considering arguments not presented to the Board as required by 29 U.S.C. § 160(e). We therefore do not reach the merits of the challenge to Acting General Counsel Solomon's appointment. We also affirm the NLRB's determination that Pier Sixty violated Sections 8(a)(1) and 8(a)(3) by discharging Hernan Perez since Perez's conduct was not so "opprobrious" as to lose the protection of the NLRA. Our decision rests heavily on the deference afforded to NLRB factual findings, made following a six-day bench trial informed by the specific social and cultural context in this case. We note, however, that Perez's conduct sits at the outer-bounds of protected, union-related comments for the reasons laid out below.

Accordingly, we **GRANT** the Board's application for enforcement and **DENY** Pier Sixty's cross-petition for review.

---

own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . .

In turn, Section 8(a) of the NLRA, 29 U.S.C. § 158(a), reads:

It shall be an unfair labor practice for an employer--

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title . . . .

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . .

## BACKGROUND

Pier Sixty operates a catering company in New York, N.Y. In early 2011, many of its service employees began seeking union representation. Following what the parties substantially agree was a tense organizing campaign that included threats from management that employees could be penalized or discharged for union activities, Pier Sixty employees voted to unionize in an October 27, 2011 election.[5]

Two days before that election, Hernan Perez was working as a server at a Pier Sixty venue. A supervisor, Robert McSweeney, gave Perez and two other servers various directions in what the NLRB's opinion describes as a "harsh tone."[6] These directions included "Turn your head that way [towards the guests] and stop chitchatting," and "Spread out, move, move."[7] McSweeney's attitude in delivering these instructions upset Perez, who viewed them as the latest instance of the management's continuing disrespect for employees. About forty-

---

[5] Pier Sixty does not contest that it violated Section 8(a)(1) of the NLRA by threatening employees, telling them bargaining would start from scratch, and disparately enforcing its no-talk rule. *See Pier Sixty, LLC,* 362 NLRB No. 59, 2015 WL 1457688, at *6 (Mar. 31, 2015); Appendix ("A") 10-11, 159, 200-202. Since we grant the NLRB's order for enforcement in its entirety, the Board may enforce its order with respect to Hernan Perez's discharge (for the reasons set forth below) and with respect to the unfair labor practices against other employees that are not challenged in this Court.

[6] *Pier Sixty, LLC,* 2015 WL 1457688, at *1.

[7] *Id.*

five minutes later, during an authorized break from work, Perez used his iPhone to post the following message on his Facebook page:

> Bob is such a NASTY MOTHER FUCKER don't know how to talk to people!!!!!! Fuck his mother and his entire fucking family!!!! What a LOSER!!!! Vote YES for the UNION!!!!!!![8]

"Bob" referred to McSweeney. Perez knew that his Facebook "friends," including ten coworkers, would be able to see the post; the post was also publicly accessible, although Perez may not have known so at the time.[9] Perez took down the post three days later, on October 28, 2011. The post had already come to the attention of the management of Pier Sixty which, following an investigation, fired Perez on November 9, 2011.[10]

Later that day, Perez filed a charge with the NLRB alleging that he had been terminated in retaliation for "protected concerted activities." On December 15, 2011, Evelyn Gonzalez, who had led organizing efforts at Pier Sixty, filed a second charge, alleging various unfair labor practices in violation of Section 8(a)(1) of the

---

[8] *Id.* at *2.

[9] *Id.* at *5.

[10] *Id.* at *2.

NLRA. On August 24, 2012, NLRB Region Two issued an amended complaint consolidating those two charges.[11]

On April 18, 2013, the presiding Administrative Law Judge ("ALJ") issued a decision finding, as relevant here, that Pier Sixty had violated Sections 8(a)(1) and 8(a)(3) of the NLRA by discharging Perez in retaliation for protected activity.[12] Pier Sixty filed exceptions,

[11] The NLRB has twenty-six regional offices, and Region Two includes the boroughs of Manhattan and the Bronx in New York City, and Orange, Putnam, Rockland and Westchester Counties. *See* NLBR, *Who We Are: Regional Offices*, https://www.nlrb.gov/region/02/area-served.

[12] The unusual structure of the NLRB bears mentioning. The investigation and issuance of complaints falls largely to the Board's Regional Directors ("RDs"), the appointment of whom is made by the General Counsel only upon approval of the Board. *See* 29 U.S.C. § 153(b) ("The Board is . . . authorized to delegate to its regional directors its powers . . . to investigate and provide for hearings . . . ."); 77 FR 45696 (July 27, 2012).

Once an unfair labor practices complaint has been issued, ALJs preside over a trial and file a decision. If no timely exceptions to that decision are filed, it automatically becomes the decision and order of the Board. *See* 29 U.S.C. § 153(d) ("The General Counsel of the Board shall exercise general supervision over all attorneys employed by the Board (other than administrative law judges and legal assistants to Board members) and over the officers and employees in the regional offices."); 29 CFR § 102.48(a) ("In the event no timely or proper exceptions are filed as herein provided, the findings, conclusions, and recommendations of the administrative law judge as contained in his decision shall, pursuant to section 10(c) of the Act, automatically become the decision and order of the Board . . . .").

While substantial power has been delegated to the RDs and ALJs, the Board's General Counsel—a Presidential appointee whose nomination is subject to the advice and consent of the Senate—retains the "final authority" with respect to "the investigation of charges and issuance of complaints" under the NLRA. *See* 29 U.S.C. § 153(d).

8

and a three-member panel of the NLRB affirmed the ALJ's decision, with one member dissenting. The NLRB filed an application for enforcement, and Pier Sixty filed a cross-petition for review that are now before this Court.

## JURISDICTION

While both parties agree that we have jurisdiction, we nonetheless consider the issue independently.[13] As an initial matter, the Board had jurisdiction over the original petition under 29 U.S.C. § 160(a)–(c), which empowers the Board to prevent unfair labor practices.[14] Exercising that power, the Board issued a final order

*Cf. Constellation Brands v. NLRB*, 842 F.3d 784, 787-89 (2d Cir. 2016) (discussing the Board's procedures for union certification and the authorities of various units).

[13] *See, e.g., Taylor v. Rogich*, 781 F.3d 647, 648 n.2 (2d Cir. 2015) (concerning our independent obligation to ascertain that we indeed have jurisdiction).

[14] Sections 10(a)-(c) of the NLRA, 29 U.S.C. §§ 160(a)–(c), provide, in relevant part:

> The Board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice (listed in section 158 of this title) affecting commerce. . . . Whenever it is charged that any person has engaged in or is engaging in any such unfair labor practice, the Board, or any agent or agency designated by the Board for such purposes, shall have power to issue and cause to be served upon such person a complaint stating the charges in that respect, and containing a notice of hearing before the Board or a member thereof, or before a designated agent or agency, at a place therein fixed, not less than five days after the serving of said complaint . . . . If upon the preponderance of the testimony taken [at the hearing] the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue and cause to be served on such person an order requiring such person to cease

in this matter on March 31, 2015.[15] Since Pier Sixty is located in New York and transacts business within this Circuit, we have jurisdiction over both the Board's petition for enforcement of that order, under Section 10(e) of the NLRA,[16] and Pier Sixty's cross-petition for review of that order, under Section 10(f) of the NLRA.[17]

---

and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this subchapter . . . .

[15] *See Pier Sixty, LLC,* 2015 WL 1457688.

[16] Section 10(e) of the NLRA, 29 U.S.C. § 160(e), provides, in relevant part:

The Board shall have power to petition any court of appeals of the United States . . . within any circuit or district . . . wherein the unfair labor practice in question occurred or wherein such person resides or transacts business, for the enforcement of such order and for appropriate temporary relief or restraining order . . . .

[17] Section 10(f) of the NLRA, 29 U.S.C. § 160(f), provides, in relevant part:

Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business . . . by filing in such a court a written petition praying that the order of the Board be modified or set aside.

In addition, Section 9(d) of the NLRA, 29 U.S.C. § 159(d) states that the record and findings made in the underlying proceeding are part of the record before this Court:

Whenever an order of the Board . . . is based in whole or in part upon facts certified following an investigation pursuant to subsection (c) of this section and there is a petition for the enforcement or review of such order, such certification and the record of such investigation shall be included in the transcript of the entire record required to be filed under subsection (e) or (f) of section 160 of this title . . . .

## DISCUSSION

### A. The Validity of the Acting General Counsel's Appointment

As an initial matter, we address Pier Sixty's argument that the Court cannot enforce the NLRB decision because the complaint against Pier Sixty was not authorized by law. We do not reach the merits of this FVRA challenge because Pier Sixty has forfeited the issue by not raising it in the proceedings before the Board.

In making this argument, Pier Sixty relies entirely on *SW General, Inc. v. NLRB*, a recent decision of the Court of Appeals for the District of Columbia Circuit ("D.C. Circuit"), which held that the NLRB's Acting General Counsel Solomon—under whose authority the complaint against Pier Sixty issued—served in violation of the FVRA, 5 U.S.C. §§ 3345 *et seq*.[18] The Supreme Court recently affirmed that decision and adopted the D.C. Circuit's interpretation of the FVRA. Once President Obama nominated Solomon (on January 5, 2011) to serve as General Counsel, the Supreme Court concluded, the FVRA prohibited Solomon from continuing his service as Acting General Counsel.[19] Pier Sixty argues that because the complaint here

---

[18] *See SW Gen., Inc. v. NLRB*, 796 F.3d 67 (D.C. Cir. 2015), *aff'd*, No. 15-1251, --- U.S. ---, 2017 WL 1050977 (Mar. 21, 2017).

[19] *SW Gen., Inc.*, 2017 WL 1050977, at *14. The NLRB General Counsel vacancy arose in June 2010, at which point Solomon qualified for "acting" service under subsection (a)(3) of the FVRA because he was a senior employee at the NLRB. In January 2011, President Obama nominated Solomon to serve as the NLRB's General Counsel on a permanent basis. The Senate never took action on the nomination, and the President ultimately withdrew Solomon's name in favor of a

was issued under the purported authority of Solomon as Acting General Counsel on August 24, 2012, it was invalid.

But unlike the petitioner in *SW General*, Pier Sixty never raised this argument before the Board. Pursuant to 29 U.S.C. § 160(e), "[n]o objection that has not been urged before the Board . . . shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." Our precedents make clear, moreover, that even an apparently meritorious challenge to the authority of an NLRB agent in itself does not qualify as an "exceptional circumstance" allowing the party to raise the argument for the first time before our Court.[20]

While we recognize that this issue, generally construed, has divided various panels of the Courts of Appeals,[21] Pier Sixty does not even cite or acknowledge *any* of those cases—aside, of course, from

---

new candidate, whom the Senate confirmed in October 2013. Throughout this period Solomon served as the Acting General Counsel. *See id.* at *7.

[20] *See Paulsen v. Remington Lodging & Hosp., LLC*, 773 F.3d 462, 467–68 (2d Cir. 2014) (rejecting as untimely a FVRA challenge to Solomon's authority to authorize an injunction under Section 10(j) of the Act); *NLRB v. Newton-New Haven Co.*, 506 F.2d 1035, 1038 (2d Cir. 1974) (refusing to grant relief on an untimely challenge to a Board decision issued by a panel consisting of one Board member and two staff attorneys, contrary to the NLRA's quorum requirements).

[21] For example, with respect to appointment challenges to the Board's quorum requirement, compare *Noel Canning v. NLRB*, 705 F.3d 490, 498 (D.C. Cir. 2013) (holding that such a challenge qualifies as an "extraordinary circumstance"), *aff'd on other grounds*, 134 S. Ct. 2550 (2014), with *NLRB v. RELCO Locomotives, Inc.*, 734 F.3d 764, 798 (8th Cir. 2013) (no "extraordinary circumstance").

12

asking us to "take judicial notice of the [D.C. Circuit's opinion in] *SW General*"[22]—let alone address any of the arguments with which those panels have grappled. Our Court has already addressed the matter, so we need not be long detained by these other decisions; we simply note that to the extent Pier Sixty's "arguments" might be construed as requesting us to reconsider our precedents, we decline to do so. Accordingly, we conclude that Pier Sixty forfeited its FVRA challenge.

## B. The NLRB's Decision That Pier Sixty Violated the NLRA by Discharging Perez

We now turn to the second question presented—namely, whether the NLRB's petition for enforcement should be granted. That question itself turns on a more particular one: was Perez's Facebook post so "opprobrious" as to lose the protection that the NLRA affords union-related speech?

In answering that question, we will accept the NLRB's factual findings "if they are supported by substantial evidence in light of the

---

[22] Pier Sixty Br. 18. Of course, the D.C. Circuit in *SW General* took care to voice its support for our conclusion that petitioners like Pier Sixty, who fail to raise an FVRA argument before the Board, will not be heard for the first time in the courts. *See* 796 F.3d at 82–83 ("[T]his case is not Son of *Noel Canning* and we do not expect it to retroactively undermine a host of NLRB decisions. We address the FVRA objection in this case because the petitioner raised the issue in its exceptions to the ALJ decision as a defense to an ongoing enforcement proceeding. We doubt that an employer that failed to timely raise an FVRA objection—regardless whether enforcement proceedings are ongoing or concluded—will enjoy the same success." (footnote omitted)).

record as a whole.”[23] Substantial evidence means “such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.”[24] Furthermore, we will not disturb the Board’s adoption of an ALJ’s credibility determinations unless “the testimony is hopelessly incredible or the findings flatly contradict either the law of nature or undisputed documentary testimony.”[25] While we review the NLRB’s legal conclusions *de novo*,[26] “[l]egal conclusions based upon the Board’s expertise should receive, pursuant to longstanding Supreme Court precedent, considerable deference.”[27]

The NLRA generally prohibits employers from discharging an employee for concerted or union-related activity. Specifically, Section 7 of the NLRA guarantees employees the right “to engage in . . . concerted activities for the purpose of collective bargaining or other mutual aid or protection.”[28] Determining whether an activity falls within the meaning of Section 7 is a task that “implicates [the Board’s] expertise in labor relations” and is for “the Board to perform

---

[23] *Starbucks Corp.*, 679 F.3d at 77 (internal quotation marks omitted); *see Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).

[24] *Kinney Drugs, Inc. v. NLRB*, 74 F.3d 1419, 1427 (2d Cir. 1996) (internal quotation marks omitted).

[25] *NLRB v. Thalbo Corp.*, 171 F.3d 102, 112 (2d Cir. 1999) (internal quotation marks omitted).

[26] *See Local Union 36 v. NLRB,* 706 F.3d 73, 82 (2d Cir. 2013).

[27] *Starbucks*, 679 F.3d at 77 (internal quotation marks omitted); *see NLRB v. Town & Country Elec., Inc.*, 516 U.S. 85, 89-90 (1995).

[28] 29 U.S.C. § 157; *see* note 4, *ante.*

in the first instance."[29]

This right to engage in union-related activity is protected by Sections 8(a)(1) and 8(a)(3) of the NLRA, which prohibit an employer from discharging employees for participating in protected, union-related activity under Section 7.[30] But even an employee engaged in ostensibly protected activity may act" in such an abusive manner that he loses the protection" of the NLRA.[31] The parties disagree about the proper framework for identifying "abusive" behavior.

The "abusive" behavior at issue here is Perez's use of obscenities in the workplace. Traditionally, the starting point for evaluating whether an employee's "uttering of . . . obscenities" in the workplace qualifies for protection under the NLRA has been the four-factor test established by the NLRB in *Atlantic Steel*.[32] That test considers: "(1) the place of the discussion; (2) the subject matter of the discussion; (3) the nature of the employee's outburst; and (4) whether

---

[29] *NLRB v. City Disposal Sys., Inc.*, 465 U.S. 822, 829 (1984) (internal quotation marks omitted).

[30] *See* note 4, *ante; see also, e.g., NLRB v. Oakes Mach. Corp.*, 897 F.2d 84, 88 (2d Cir. 1990) (unlawful to discharge or take other personnel action against employee for protected concerted activity); *Office & Prof'l Emps. In'l Union, AFL-CIO, CLC v. NLRB*, 981 F.2d 76, 81 & n.4 (2d Cir. 1992) (unlawful to discharge employee for union activity and such actions derivatively violate Section 8(a)(1) because antiunion-motivated discipline necessarily discourages union activities).

[31] *City Disposal Sys., Inc.*, 465 U.S. at 837.

[32] 245 NLRB at 816.

the outburst was, in any way, provoked by an employer's unfair labor practice."[33]

But the *Atlantic Steel* test has come under pressure in recent years. In *NLRB v. Starbucks*, this Court concluded that the *Atlantic Steel* test gave insufficient weight to employers' interests in preventing employees' outbursts "in a public place in the presence of customers" and we suggested more balanced standards for evaluating "opprobrious" conduct in that context.[34] We remanded the cause to the NLRB to develop an appropriate test for determining the NLRA's "protection for an employee who, while discussing employment issues, utters obscenities in the presence of customers."[35]

At about the same time, the General Counsel's Office began developing new guidance for evaluating an employee's use of social media that went in a more employee-friendly direction and that limited the ability of employers to issue rules regarding use of social media, even where employees were posting public criticisms of their employers and workplace.[36] This new guidance built upon a

---

[33] *Id.*

[34] *Starbucks*, 679 F.3d at 79.

[35] *Id.* at 80. On remand, however, the Board "assume[d] that [the] conduct lost the protection of the Act" but found a violation of the Act on other grounds. *See Starbucks Corp.*, 360 NLRB 1168, 1169 (2014).

[36] *See* NLRB OFFICE OF GEN. COUNSEL, REPORT OF THE ACTING GENERAL COUNSEL CONCERNING SOCIAL MEDIA CASES, MEMORANDUM OM 12-59 (May 30, 2012); NLRB OFFICE OF GEN. COUNSEL, REPORT OF THE ACTING GENERAL COUNSEL

regularly-observed distinction between activity outside the workplace and confrontations in the immediate presence of coworkers or customers.[37] In light of the General Counsel's new guidance, the Board has utilized the nine-factor "totality of the circumstances" test in recent social media cases.[38]

---

CONCERNING SOCIAL MEDIA CASES, MEMORANDUM OM 12-31 (Jan. 24, 2012); *see also* NLRB OFFICE OF GEN. COUNSEL, REPORT OF THE ACTING GENERAL COUNSEL CONCERNING SOCIAL MEDIA CASES, MEMORANDUM OM 11-74, at 5–6, 12 (Aug. 18, 2011). We note, however, that advice memoranda from the General Counsel do not constitute precedential authority and are not binding on the Board, *see Midwest Television, Inc.*, 343 NLRB 748, 762 n.21 (2004), much less on the courts.

[37] *See, e.g., Starbucks*, 679 F.3d at 78-80 (distinguishing between outbursts in public venues versus private spaces).

[38] *See, e.g., Richmond Dist. Neighborhood Ctr.*, 361 NLRB No. 74, 2014 WL 5465462, at *2 n.6 (Oct. 28, 2014) (holding, in the absence of exceptions to applying a totality-of-circumstances test, that egregiousness of a private Facebook conversation could be examined using such a test); *accord Fresenius USA Mfg.*, 358 NLRB 1261, 1267-68 (2012), *superseded on other grounds by* 362 NLRB No. 130, 2015 WL 3932160 (June 24, 2015).

The "totality of the circumstances" test for evaluating an employee's use of social media may consider the following factors: (1) any evidence of antiunion hostility; (2) whether the conduct was provoked; (3) whether the conduct was impulsive or deliberate; (4) the location of the conduct; (5) the subject matter of the conduct; (6) the nature of the content; (7) whether the employer considered similar content to be offensive; (8) whether the employer maintained a specific rule prohibiting the content at issue; and (9) whether the discipline imposed was typical for similar violations or proportionate to the offense. *Pier Sixty, LLC,* 2015 WL 1457688, at *3.

The aforementioned tests, though most relevant to the conduct at issue here, are not the exclusive frameworks through which the Board has evaluated whether employee conduct is entitled to NLRA protection.

17

In the present case, after adopting the ALJ's factual findings, the Board analyzed Perez's Facebook post using the nine-factor "totality of the circumstances" test. While we are not convinced the amorphous "totality of the circumstances" test adequately balances an employer's interests,[39] Pier Sixty did not object to the ALJ's use of the test in evaluating Perez's statements before the Board. For that reason, we need not, and do not, address the validity of that test in this opinion.[40]

Instead, Pier Sixty argues that the Board's decision—that "Perez' comments were not so egregious as to exceed the Act's protection"[41]—is not supported by "substantial evidence" in the record. It is not entirely clear whether Pier Sixty is challenging the factual findings of the Board or its legal conclusions. Regardless of whether we are reviewing the factual findings under a "substantial evidence" standard or the legal conclusions under a "considerable deference" standard, the Board's decision in this case is justified.[42] Several factors inform our conclusion.

---

[39] *Cf. Id.* at *5 (Johnson, Member, dissenting in part) ("My colleagues convert this ['totality of the circumstances'] analysis into what is, in effect, an *Atlantic Steel* test on steroids that is even more susceptible to manipulation based on 'agency whim' than the 4-factor *Atlantic Steel* test." (footnote omitted))

[40] *See, e.g., NLRB v. GAIU Local 13-B*, 682 F.2d 304, 311-12 (2d Cir. 1982) (on failure to object to an ALJ's use of a particular test).

[41] *Pier Sixty, LLC,* 2015 WL 1457688, at *3.

[42] *See Local Union 36*, 706 F.3d at 82 (stating the well-established standards of review).

First, even though Perez's message was dominated by vulgar attacks on McSweeney and his family, the "subject matter" of the message included workplace concerns—management's allegedly disrespectful treatment of employees, and the upcoming union election. Pier Sixty had demonstrated its hostility toward employees' union activities in the period immediately prior to the representation election and proximate to Perez's post. Pier Sixty had threatened to rescind benefits and/or fire employees who voted for unionization.[43] It also had enforced a "no talk" rule on groups of employees, including Perez and Gonzalez, who were prevented by McSweeney from discussing the Union. Perez's Facebook post explicitly protested mistreatment by management and exhorted employees to "Vote YES for the UNION."[44] Thus, the Board could reasonably determine that Perez's outburst was not an idiosyncratic reaction to a manager's request but part of a tense debate over managerial mistreatment in the period before the representation election.

Second, Pier Sixty consistently tolerated profanity among its workers. The ALJ found that Pier Sixty had not previously disciplined employees for widespread profanity in the workplace, including the words "fuck" and "motherfucker," among other expletives and racial slurs. The Board relied on evidence that, in the

---

[43] *See Pier Sixty, LLC,* 2015 WL 1457688, at *6; A 10-11, 159, 200-02 (finding that, in meetings prior to the election, Giordano told employees that they could lose their jobs and all employees would lose current benefits, including their 401(k) plan, gym privileges, tuition reimbursement, and medical and dental insurance).

[44] *Pier Sixty, LLC,* 2015 WL 1457688, at *2.

19

context of daily obscenities, Pier Sixty only issued five written warnings to employees for such an offense in the six years prior to Perez's discharge. And there was no evidence that Pier Sixty has ever discharged an employee solely for the use of offensive language. The ALJ specifically credited employee testimony that Chef DeMaiolo and McSweeney cursed at employees on a daily basis including screaming phrases such as "What the fuck are you doing?," "Motherfucker," and "Are you guys fucking stupid?"[45] We recognize that one could draw a distinction between generalized scatology (or even cursing *at* someone), and, on the other hand, cursing someone's mother and family.[46] But one could reasonably decide, as the ALJ did

---

[45] *Id.* at *6. *See Thalbo Corp.*, 171 F.3d at 112 (explaining courts will not disturb the Board's adoption of a judge's credibility determinations unless "the testimony is hopelessly incredible or the findings flatly contradict either the law of nature or undisputed documentary testimony" (internal quotation marks omitted)).

[46] *Cf. Pier Sixty, LLC,* 2015 WL 1457688, at *5 (Johnson, Member, dissenting in part).

Much has been written on "fighting words" that are so insulting in both content and delivery that they are likely to provoke the listener to respond violently. *See Cohen v. California*, 403 U.S. 15, 20 (1971) (defining ''fighting words'' as ''those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction''); *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942) (defining ''fighting words'' as ''those which by their very utterance inflict injury or tend to incite an immediate breach of the peace'').

Different groups respond to the same words differently. *See generally* José Mateo & Francisco Yus, *Towards a Cross-Cultural Pragmatic Taxonomy of Insults*, 1 J. OF LANG. AGGRESSION & CONFLICT 87-114 (2013) (examining cursing and verbal abuse in varying cultural contexts). Among some groups, certain maternal insults could be perceived as "fighting words." *See* LIZA BAKEWELL, MADRE: PERILOUS JOURNEYS WITH A SPANISH NOUN 64, 74 (2011) ; *see also* Silvia Kaul de Marlangeon,

in this case, that Perez's comments "were not a slur against McSweeney's family but, rather, an epithet directed to McSweeney himself."[47] Under the circumstances presented here, it is striking that Perez—who had been a server at Pier Sixty for thirteen years—was fired for profanities two days before the Union election when no employee had ever before been sanctioned (much less fired) for profanity.

Third, the "location" of Perez's comments was an online forum that is a key medium of communication among coworkers and a tool for organization in the modern era. While a Facebook post may be visible to the whole world, including actual and potential customers, as Pier Sixty argues, Perez's outburst was not in the immediate presence of customers nor did it disrupt the catering event.[48] Furthermore, Perez asserts that he mistakenly thought that his Facebook page was private and took the post down three days later, upon learning that it was publicly accessible. We thus conclude,

---

et al., *A Typology of Verbal Impoliteness Behaviour for the English and Spanish Cultures*, 25 REVISTA ESPAÑOLA DE LINGÜÍSTICA APLICADA 69-92 (2012) (evaluating differences in verbal impoliteness across Spanish-speaking cultures). This contrasts to other groups where maternal insults carry different social and cultural connotations. *See* BAKEWELL, MADRE: PERILOUS JOURNEYS WITH A SPANISH NOUN 44 ("[A]ll over the world groups of people have their ways to insult mothers or use mothers to insult others.").

[47] *Pier Sixty, LLC*, 2015 WL 1457688 at *4 (internal quotation marks omitted).

[48] *Cf. Starbucks*, 679 F.3d at 79 ("[T]he analysis of the ALJ and the Board improperly disregarded the entirely legitimate concern of an employer not to tolerate employee outbursts containing obscenities in the presence of customers.").

21

according appropriate deference to the Board's factual findings and interpretation of the NLRA, that the Board did not err in ruling that Perez's Facebook post, although vulgar and inappropriate, was not so egregious as to exceed the NLRA's protection. Nor was his Facebook post equivalent to a "public outburst" in the presence of customers and thus can reasonably be distinguished from other cases of "opprobrious conduct."[49]

In sum, Pier Sixty has failed to meet its burden of showing that Perez's behavior was so egregious as to lose the protection of the NLRA under the Board's "totality-of-the-circumstances" test. However, we note that this case seems to us to sit at the outer-bounds of protected, union-related comments, and any test for evaluating "opprobrious conduct" must be sufficiently sensitive to employers' legitimate disciplinary interests, as we have previously cautioned.[50] We have considered all of Pier Sixty's objections to enforcement and have found them to be without merit.

## CONCLUSION

To summarize, we hold as follows:

(1) Pier Sixty has forfeited its challenge to the legality of Acting General Counsel Solomon's appointment by failing to raise

---

[49] *See, e.g., NLRB v. Washington Aluminum Co.*, 370 U.S. 9, 17 (1962) (holding that certain employee conduct crosses the line from protected activity to "indefensible" conduct that loses NLRA protections).

[50] *See Starbucks*, 679 F.3d at 79.

it before the Board as required by 29 U.S.C. § 160(e). Since it has not argued the existence of an "extraordinary circumstance," which would allow us to waive the ordinary rule against considering arguments not presented to the Board, we do not reach the merits of its FVRA challenge.

(2) The NLRB's petition for enforcement—urging that Pier Sixty violated Sections 8(a)(1) and 8(a)(3) of NLRA by discharging Hernan Perez since Perez's conduct was not so "opprobrious" as to lose the protection of the NLRA—is granted. Our conclusion rests heavily on the deference afforded to NLRB's interpretation of the NLRA and its factual findings, which, in the instant case, were informed by a six-day bench trial. We note, however, that Perez's conduct sits at the outer-bounds of protected, union-related comments.

For the foregoing reasons, we **GRANT** the Board's application for enforcement and **DENY** Pier Sixty's cross-petition for review.